UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LOREN STOUT and PIPER STOUT,                                    Civil No. 09-152-HA

     Plaintiffs,                                                  OPINION AND ORDER

     v.

U.S. FOREST SERVICE, and U.S. FISH
AND WILDLIFE SERVICE,

     Defendants.

_____

HAGGERTY, District Judge:

     Plaintiffs filed this action for declaratory and injunctive relief against the United States

Forest Service (Forest Service) and the United States Fish and Wildlife Service (FWS).

Plaintiffs assert claims under the Endangered Species Act (ESA), the Administrative Procedures

Act (APA), the Wild Free-Roaming Horses and Burros Act (Wild Horses Act), and the National

Forest Management Act (NFMA).  The parties seek partial summary judgment on Claims I and II

of plaintiffs' Second Amended Complaint.

1 - OPINION AND ORDER

On February 25, 2011, the parties submitted a stipulation dismissing Count II of plaintiffs' Second Amended Complaint against the FWS without prejudice.  Accordingly, the parties' motions for summary judgment as to Claim II are denied as moot.   For the following reasons, plaintiffs' Motion for Partial Summary Judgment [33] is GRANTED IN PART and DENIED IN PART, and defendants' Cross-Motion for Partial Summary Judgment [55] is DENIED.

**STANDARDS**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On summary judgment, the court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-49.

**BACKGROUND**

Plaintiffs own a ranching operation near Dayville, Oregon.  They hold permits to graze cattle on the Murderer's Creek Allotment, which is located within the Murderer's Creek Wild Horse Territory (WHT).  Plaintiffs allege that the Forest Service violated the ESA by approving a

2 - OPINION AND ORDER

wild horse management plan without consulting with the National Marine Fisheries Service

(NMFS). Second Am. Compl. at 11.  Defendants contend that plaintiffs' claim is not justiciable,

and that plaintiffs failed to establish that the Forest Service's duty to consult was triggered by its

adoption of the plan.

> A.      The ESA

The purpose of the ESA is "to provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation" of such species.  16 U.S.C. § 1531(b) (2006).  The Secretary of the Interior

must list species that are endangered or threatened, and designate critical habitat for that species.

*Id.* § 1533(a).  Once a species has been listed, federal agencies have an affirmative duty under

section 7 of the ESA to conserve that species and to prevent take violations.  *Id.* § 1536.

As required under its section 7 duties, a federal agency such as the Forest Service must

"insure that any action authorized, funded, or carried out by such agency . . . is not likely to

jeopardize the continued existence of any endangered or threatened species or result in the

destruction or adverse modification" of such species' critical habitat.  *Id.* § 1536(a)(2).  Whenever

a federal agency determines that a proposed action "may affect listed species or critical habitat,"

that agency must prepare a biological assessment (BA) on the effects of the action.  50 C.F.R. §

402.14(a); 16 U.S.C. § 1536(c).  If after preparing the BA the agency determines that the

proposed action is not likely to adversely affect any listed species or critical habitat, then the

agency need not initiate formal consultation with the NMFS.[1]  50 C.F.R. § 402.13.

---

[1] The NMFS has jurisdiction over anadromous fish species such as the steelhead at issue
in this litigation.

If the agency determines that the proposed action is likely to adversely affect a listed

species or critical habitat, the agency must consult with the NMFS to determine whether the

agency action is likely to jeopardize that species or adversely modify its critical habitat. *Id.*; 16

U.S.C. § 1536(c). Once formal consultation is initiated, the NMFS must review all relevant

information and formulate a biological opinion (BiOp) regarding whether the action is likely to

result in jeopardy to a listed species. 50 C.F.R. § 402.14(g).

### B.    The Wild Horses Act

Congress enacted the Wild Horses Act in 1971 to protect wild free-roaming horses and

burros as an integral part of the natural area where they were found. 16 U.S.C. § 1331. The

Secretary is directed to manage wild free-roaming horses and burros in a manner that is

"designed to achieve and maintain a thriving natural ecological balance on the public lands," and

must consult with the state wildlife agency to ensure that the natural balance of all wildlife

species is considered. *Id.* § 1333(a).

To comply with his management duties, the Secretary must maintain an inventory of the

wild free-roaming horses and burros to determine any populations issues, appropriate

management levels, and to decide if any action should be taken to remove or destroy excess

animals. *Id.* § 1333(b). This determination must be made in consultation with the FWS, state

wildlife agencies, and other designated individuals. *Id.*

### C.    The APA

The APA sets forth standards to enable courts to review the decisions of federal

administrative agencies. *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999). Under the APA, a

district court may overturn an agency action only if the action was "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or.*

4 - OPINION AND ORDER

*Natural Res. Council*, 490 U.S. 360, 377 (1989); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).  To determine whether an agency decision is arbitrary and capricious, courts should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378.

A decision is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2011).  Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency.  *Id.*

When a plaintiff brings a claim under the ESA or the Wild Horses Act, the APA's arbitrary and capricious standard applies.  *See W. Watersheds Project v. Kraayenbrink*, _ F.3d _, 2011 WL 149363, at *6 (9th Cir. 2011) (ESA); *Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D.C. Nev. 1975) (Wild Horses Act).

**D.    Factual Background**

The Murderer's Creek WHT encompasses approximately 180,000 acres of land owned by the Forest Service, the Bureau of Land Management (BLM)[2], the Oregon Department of Fish and Wildlife, and private parties.  In 1975, the Forest Service and BLM adopted a plan (1975 Wild Horse Plan) for managing the herd of wild horses in the Murderer's Creek WHT.  The 1975 Wild Horse Plan provided census information, discussed management measures, and clarified the

_____

[2] The BLM was dismissed from this action on December 14, 2010.

5 - OPINION AND ORDER

agencies' joint objective to "[m]aintain the herd of wild, free-roaming horses that ranges on the area not to exceed 100 head."  AR 580-81.[3]  The agencies estimated that 174 horses resided on the land, and planned to reduce the numbers to between 60-70 horses.  AR 579, 581.  One year later, the Forest Service changed its estimate to 200 horses, and adopted procedures for controlling the herds to keep the numbers consistent with the objective set forth in the 1975 Wild Horse Plan.  AR 611-13.

In 1984, the Forest Service prepared and adopted an amended management plan for the Murderer's Creek WHT.  AR 648.  The plan updated the Forest Service's population objectives to an average of 100 "horse units" (animals above weaning age), which would not exceed 140 horse units.  AR 651.

Subsequently, the NMFS listed the Middle Columbia River (MCR) steelhead as "threatened" under the ESA.  64 Fed. Reg. 14517 (Mar. 25, 1999).  These steelhead utilized streams and rivers located within the John Day River Basin for spawning, rearing, and migration. *Id.*  The NMFS also designated streams within the Murderer's Creek WHT as critical habitat for the MCR steelhead.

The Forest Service began consulting with the NMFS in 2004 regarding the effects of its wild horse gathering operations within the Murderer's Creek WHT.  AR 13683.  The Forest Service submitted a BA for its proposed gathering operations from 2004 through 2008.  AR 13688-13726.  The Forest Service concluded that its horse gathering operations "may affect" but were "not likely to adversely affect" the MCR steelhead.  AR 13688.  The Forest Service requested a letter of concurrence from the NMFS on its "not likely to adversely affect" finding,

---

[3] "AR" designates the Forest Service's Administrative Record.

6 - OPINION AND ORDER

and the NMFS agreed to issue the letter.  AR 13740-43.  The agencies later agreed that the

effects of similar gathering operations from 2009-2014 within the Murderer's Creek WHT were

also not likely to adversely affect MCR steelhead.  AR 30574-76.

In 2007, the agencies adopted the current management plan (2007 Wild Horse Plan).  AR

25376-25413.  The 2007 Wild Horse Plan used an "appropriate management level" (AML) of 50-

140 horses.  AR 25382.  The plan explained that census data from a 2006 study revealed that

approximately 436 horses were present in the Murderer's Creek WHT.  AR 25384.  The plan

directed the authorized officer to gather and remove excess horses according to five priorities: (1)

emergencies requiring immediate adjustment in horse populations to maintain ecological

balance; (2) court orders; (3) strays; (4) achieving AMLs; and (5) periodic unscheduled removals

near steelhead habitats.  AR 25387.

Plaintiffs enjoy hunting, fishing, hiking, and recreating in the Murderer's Creek WHT.

Stout Decl. at 2.  They also graze cattle on lands within the Murderer's Creek WHT.  *Id.*

In 2008, this court enjoined plaintiffs from grazing based on violations of the bank

alteration standards for streams within the Murderer's Creek Allotment.  *See ONDA v. Kimbell*,

No. 07-1871-SU, 2008 WL 4186913 at *8 (D. Or. Sept. 5, 2008).  Plaintiffs submitted

declarations during those proceedings to show that many of the monitoring sites where violations

occurred experienced concentrated use from wild horses.  Stout Decl. at 3.  This court partially

vacated the injunction to allow grazing in 2009.  *ONDA v. Kimbell*, No. 07-1871-HA, 2009 WL

1663037 (D. Or. June 15, 2009).  However, plaintiffs were able to graze their cattle for only

nineteen days in 2009, primarily on one pasture, because the bank alteration standards had

already been violated on several pastures.  Stout Decl. at 3-4.  Plaintiffs contend that these

violations were due to the overpopulation of wild horses in the area.

7 - OPINION AND ORDER

**DISCUSSION**

Defendants contend that plaintiffs' Claim I is not justiciable because plaintiffs lack

standing and because the 2007 Wild Horse Plan does not constitute a final agency action.  These

arguments are addressed in turn.

**A.      Standing**

To satisfy the standing requirements of Article III of the United States Constitution, a

plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical; (2) the injury is fairly
> traceable to the challenged action of the defendant; and (3) it is likely, as opposed
> to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Standing must be assessed "at the outset of the litigation." *Id.* at 180.  If a plaintiff alleges a

violation of the APA, he or she must also show that the alleged injury falls within the "zone of

interests" that the statute was designed to protect.  *Cantrell v. City of Long Beach*, 241 F.3d 674,

679 (9th Cir. 2001).

Plaintiffs allege that the land they use for grazing their cattle has been overrun by wild

horses, resulting in less forage for their cattle, reduced grazing days, and potential harm to

threatened MCR steelhead.  Pls.' Mem. at 18-19; Stout Decl. at 4-5.  Plaintiffs allege that they are

"suffering significant and ongoing personal and financial disruption by being prevented from

keeping livestock on the [Murderer's Creek Allotment]."  Stout Decl. at 6.  Plaintiffs have

suffered an actual and concrete injury to their business due to the Forest Service's alleged failure

to comply with the ESA.

Plaintiffs have also suffered an injury within the ESA's intended zone of interests. Although the ESA's overall purpose involves species preservation, plaintiffs' economic injuries also fall within its zone of interests. *See Bennett v. Spear*, 520 U.S. 154, 176-77 (1997) (holding that the ESA's procedural requirements also seek to "avoid economic dislocation" to parties as a result of an erroneous agency decision). Additionally, plaintiffs' economic interests can be paired with a species preservation interest because the restoration of the MCR steelhead could lead to more grazing opportunities for plaintiffs' cattle. *See Pac. Nw. Generating Co-Op v. Brown*, 38 F.3d 1058, 1065 (9th Cir. 1994).

Defendants do not dispute that plaintiffs have suffered an injury-in-fact. Instead, defendants challenge the plaintiffs' ability to establish causation and redressability. Defendants assert that plaintiffs' injuries were not caused by the 2007 Wild Horse Plan because the plan shares an objective with plaintiffs—the removal of excess horses from the Murderer's Creek WHT—and that a favorable ruling from this court would not redress plaintiffs' injuries. This court disagrees.

Plaintiffs' claim is based on the Forest Service's failure to consult under section 7 of the ESA. This claim alleges a procedural injury. *See Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 957 (9th Cir. 2005) (reversed on other grounds by *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)). Because plaintiffs' claim is procedural, the burden to demonstrate causation and redressability is relaxed and plaintiffs need only show that a section 7 consultation *could* protect their concrete interests. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992)); *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003) (noting that the causation element "is only implicated where the

9 - OPINION AND ORDER

concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant").

Plaintiffs assert that the Forest Service's management decisions have directly caused the harm to MCR steelhead and plaintiffs' economic interests in the land. Pls.' Mem. at 19. The 2007 Wild Horse Plan provides management goals to reduce the number of wild horses within the Murderer's Creek WHT, but those objectives have failed to prevent the harms claimed by plaintiffs. Plaintiffs have alleged a concrete interest in a particular parcel of land that has been impaired by the Forest Service's conduct. *See Defenders of Wildlife*, 420 F.3d at 957. Under the relaxed standard for procedural claims, the court concludes that plaintiffs have met their causation burden.

Plaintiffs have also demonstrated that their interests could be redressed following consultation. As plaintiffs assert, the Forest Service could revise its AMLs to mitigate future environmental impacts, commit to a more aggressive gathering schedule, or be required to prepare a BiOp and Incidental Take Statement. Pls.' Mem. at 20. These potential outcomes could redress plaintiffs' injuries. *See Salmon Spawning*, 545 F.3d at 1226-27 (noting that redressability is met if the requested relief "may influence the agency's ultimate decision of whether to take or refrain from taking a certain action"). Accordingly, plaintiffs have standing to pursue their Claim I.

### B.    Final Agency Action

Defendants also contend that plaintiffs' claim is not justiciable because the adoption of the 2007 Wild Horse Plan should not constitute a final agency action within the purview of the APA. Defendants assert that the 2007 Wild Horse Plan "does nothing to alter the legal regime. . . . [and] does not mandate any particular outcome." Defs.' Mem. at 12. Defendants contend that

the Forest Service is only bound by the Wild Horses Act and the implementing regulations, not

the 2007 Wild Horse Plan.  This court disagrees.

Under the APA, two conditions must be satisfied for an agency action to be considered

final.  *Bennett*, 520 U.S. at 177-78.  The action must (1) mark the consummation of the agency's

decision-making process, and (2) be an action by which rights or obligations have been

determined, or from which legal consequences will flow.  *Id.* (citations omitted).

The court must determine whether the agency has completed its decision-making process,

and whether the result of that process is one that will directly affect the parties.  *Or. Natural*

*Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quotations and citations

omitted).  In making that determination, the court looks for actions that amount to a "definitive

statement of the agency's position," have a "direct and immediate effect on the day-to-day

operations of the subject party," or where immediate compliance with the terms is expected.  *Id.*

(quotations and citations omitted).

A land use plan is generally a statement of priorities that guides and constrains actions,

but does not usually prescribe them.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 71

(2004).  Therefore, area-wide management practices under a land use plan cannot be challenged

as a final agency action.  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009); *see also*

*Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (requiring a

litigant's challenge to be "more than a programmatic attack or a vague reference to Forest Service

action or inaction").

A management plan should not be considered final agency action if it merely sets goals

and methods, and does not authorize specific conduct.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*,

523 U.S. 726, 729-30 (1998) (finding no final agency action where "considerable legal distance"

11 - OPINION AND ORDER

existed between the adoption of the plan and the challenged conduct); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (holding that a final agency action must include a particular order, regulation, or set of regulations; not a continuing and constantly changing operation).

However, a management plan may be challenged if it expressly commits the agency to certain actions. *See Norton*, 542 U.S. at 71. To be reviewable, the plan should command or restrict conduct; grant, withhold, or modify legal authority; or create legal rights or obligations. *Ohio Forestry*, 523 U.S. at 733. A litigant may challenge the approval of a plan if imminent injury will result from the plan's authorization or prohibition of certain conduct, or if he or she alleges a site-specific injury causally related to a defect in the plan. *Wilderness Soc. v. Thomas*, 188 F.3d 1130, 1133-34 (9th Cir. 1999) (holding that a challenge to the approval of a management plan without identifying lands suitable for grazing was ripe for review). Similarly, if an agency's future actions must be consistent with the plan, and the litigant's grievance is with the overall plan, he or she may challenge the approval of the plan and "need not wait to challenge a specific project." *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993).

The dispositive issue is whether the 2007 Wild Horse Plan represents the Forest Service's final and binding decision regarding the management of wild horses within the Murderer's Creek WHT. *See Or. Natural Desert Ass'n*, 465 F.3d at 984. Although defendants contend that the 2007 Wild Horse Plan is not binding on them, defendants did not submit any declarations or other documentary evidence to support that assertion. After reviewing the administrative record, this court finds that the Forest Service committed itself to the standards identified in the 2007 Wild Horse Plan.

12 - OPINION AND ORDER

Pursuant to the Wild Horses Act, the Forest Service implemented regulations for

managing wild horses and burros on National Forest land.  36 C.F.R § 222.20.  The regulations

provide that the Forest Service shall "[a]nalyze each wild horse or burro territory and, based on

the analysis, develop and implement a management plan, which analysis and plans will be

updated, whenever needed, as determined by conditions on each territory."  36 C.F.R. §

222.21(a)(4).  The regulations require the Forest Service to engage in a decision-making process

to analyze the needs of each territory, and then develop an appropriate management plan.

The 2007 Wild Horse Plan "provides the management objectives and guidelines for

managing wild horses on the [Murderer's Creek WHT]."  AR 25380.  AMLs are used to represent

"the optimum wild horse population which will not degrade the rangeland resource and will

provide for the attainment of habitat objectives in correlation with other acceptable multiple uses

and . . . maintaining healthy population while incorporating gather cycle considerations."  *Id.*

The plan provides that wild horses shall be managed at an AML of 50-140 horses, and that if the

"estimated population reaches or exceeds the upper level of AML," the excess animals will be

humanely gathered and removed according to specific priorities.  AR 25387.

These standards and guidelines do not merely set goals.  The Forest Service has based its

decisions to conduct horse gathering operations according to the standards set out in the 2007

Wild Horse Plan.  AR 30547-70, 30571-73.  In a 2009 document, the Forest Service explicitly

stated that the 2007 Wild Horse Plan outlines the provisions and guidelines that it "needs to

follow before, during, and after gathers."   AR 30850-52.  It also explained that the "Forest

Service is following and will continue to follow these guidelines and instructions."  AR 30852.

Although the Forest Service prepared BAs for previous gathering operations, it later

decided to continue its gathering operations without conducting any additional procedures

13 - OPINION AND ORDER

required under the National Environmental Policy Act based in part on the Forest Service's compliance with the 2007 Wild Horse Plan.  AR 13683-13726, 30850-52.

The 2007 Wild Horse Plan is construed as a final agency action because it sets specific management protocols for wild horses, and describes when, why, and in what order of priority any excess horses shall be removed from the territory.  *See Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1113 (D. Ariz. 2009) (holding that an agency's adoption of operating documents was a final agency action because it established specific control measure protocols, specified when and why those measures could be used, set boundaries on discretionary program management, and substantively changed the agency's responsibilities).

The plan also does not appear to be temporary.  The AML standards, management guidelines, and removal criteria are not subject to further consideration and are unlikely to change.  The plan lists specific information that "would trigger the need for an adjustment in horse numbers and subsequent gather and adoption and/or other population control measures[.]" AR 25387-88.  Although the projected removal of wild horses was made expressly subject to budgetary and other changes, the budgetary disclaimer does not affect the binding nature of the AML standards set out in the plan.  AR 25396.  These factors support a finding that the plan is a final agency action.  *See Fairbanks N. Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 591-92 (9th Cir. 2008) (holding that an agency's jurisdictional determination was a reviewable action because it was valid for five years, the agency's position would only be changed if new information was provided, and it was devoid of any suggestion that it was subject to further consideration or modification).

The 2007 Wild Horse Plan constitutes the Forest Service's definitive statement on management levels within the Murderer's Creek WHT, had a direct and immediate effect on the

14 - OPINION AND ORDER

agency's day-to-day operations, and required immediate compliance with its terms. *See Or. Natural Desert Ass'n*, 465 F.3d at 982. Because the 2007 Wild Horse Plan is a reviewable final agency action, this court must analyze the merits of plaintiffs' claim.

C.      **Merits**

There is no dispute that threatened MCR steelhead and designated critical habitat are present within the Murderer's Creek WHT. *See* 50 C.F.R. § 226.212(r). Therefore, because the Forest Service was aware that a listed species was present in the area of its proposed action, it was required to prepare a BA to determine whether the proposed action was likely to affect the species, and whether formal consultation with the NMFS was required. *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985); 16 U.S.C. § 1536(c). Formal consultation involves the preparation of a BA, and culminates with the issuance of a BiOp, and if necessary, an incidental take statement. 50 C.F.R. §§ 402.14(c)(6), (g)(4); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1570 (9th Cir. 1993). If an agency fails to follow the ESA's procedural consultation requirements, it cannot determine whether its proposed action will result in a violation of the ESA's substantive provisions. *Thomas*, 753 F.2d at 763.

Defendants admit that the Forest Service "did not consult on the 2007 Wild Horse Plan pursuant to Section 7(a)(2) of the ESA." Defs.' Answer to Second Am. Compl. at 10, ¶ 25. However, defendants contend that the adoption of the 2007 Wild Horse Plan did not trigger a duty to consult under the ESA.

An agency action that triggers the ESA's consultation requirements includes any activity or program that was authorized, funded, or carried out, in whole or in part, by a federal agency. 50 C.F.R. § 402.02. The term "agency action" should be construed broadly. *Lane Cnty. Audubon Soc. v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992).

15 - OPINION AND ORDER

The adoption and implementation of management plans with area-specific standards and guidelines that could be in place for several years is considered an agency action under the ESA. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994). An agency will violate the ESA if it adopts and implements a management plan without complying with its consultation requirements. *Id.* at 1053-55 (holding that land management plans have long-lasting effects even after their adoption because every individual project within the plan's coverage must be implemented according to the plan).

This court finds that the adoption of the 2007 Wild Horse Plan was an agency action subject to the ESA. As previously discussed, the 2007 Wild Horse Plan sets standards for managing wild horses within the Murderer's Creek WHT, and dictates the provisions and guidelines that the Forest Service must follow for any gathering operation.

Moreover, the plan may affect listed species because it sets forth criteria for managing wild horses within the MCR steelhead's critical habitat. *See Pacific Rivers*, 30 F.3d at 1055; AR 25383 (noting that when the herd level was at 200 horses, significant use and damage occurred to the land), 25390-91 (noting poor conditions where horses grazed). Accordingly, the Forest Service was required to consult with the NMFS and prepare a BA before it adopted and implemented the 2007 Wild Horse Plan. The Forest Service's failure to comply with its duty under section 7 was arbitrary and capricious. *Lands Council*, 629 F.3d at 1074 (holding that a decision is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem"); *see also W. Watersheds Project*, 2011 WL 149363, at *23 (holding that the agency's failure to consult was arbitrary and capricious).

Because a violation of the ESA has occurred, this court agrees with plaintiffs that the Forest Service should initiate consultation on its horse management plan while the 2007 Wild

16 - OPINION AND ORDER

Horse Plan remains in effect. *See also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524

F.3d 917, 925, 937-38 (9th Cir. 2008) (holding that the district court's remand order was proper

where it required the agencies to issue a new BiOp while leaving the challenged BiOp in place).

## CONCLUSION

For the reasons provided, plaintiffs' Motion for Partial Summary Judgment [33] is

GRANTED as to plaintiffs' Claim I, and DENIED AS MOOT as to plaintiffs' Claim II.  The

2007 Wild Horse Plan is remanded to the Forest Service.  The Forest Service shall initiate

consultation on its horse management plan while the 2007 Wild Horse Plan remains in effect.

The remand period shall be one year.  Defendants' Cross-Motion for Partial Summary Judgment

[55] is DENIED as to plaintiffs' Claim I, and DENIED AS MOOT as to Plaintiffs' Claim II.

IT IS SO ORDERED.

DATED this 10th day of March, 2011.


                                              /s/ Ancer L. Haggerty
                                              Ancer L. Haggerty
                                        United States District Judge