UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| LOREN STOUT and PIPER STOUT, | Case No. 2:09-cv-00152-HA |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| U.S. FOREST SERVICE, and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

HAGGERTY, District Judge:

Plaintiffs filed this action for declaratory and injunctive relief against the United States Forest Service (Forest Service) and the United States Fish and Wildlife Service (FWS). Plaintiffs assert claims pursuant to the Wild Free-Roaming Horses and Burros Act (Wild Horses Act), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA). This court previously granted summary judgment to plaintiffs on Claim I of their Second Amended Complaint and Claim II was dismissed pursuant to stipulation of the parties. The parties now cross move for summary judgment on Claims III, IV, and V. Oral argument was held on April 5, 2012. For the following reasons, plaintiffs' Motion for Summary Judgment [69] is denied and defendants' Cross-Motion for Summary Judgment [75] is granted in part and denied in part.

1 - OPINION AND ORDER

**OVERVIEW**

Plaintiffs own a ranching operation near Dayville, Oregon. They hold permits to graze cattle on the Murderer's Creek Allotment, which is located within the Murderer's Creek Wild Horse Territory (MCWHT) in the Malheur National Forest (MNF). Plaintiffs seek summary judgment on the three remaining claims of the Second Amended Complaint. Plaintiffs assert that the appropriate management level (AML) of 100 horses selected by the Forest Service in the 2007 Wild Horse Plan was arbitrary and capricious (Claim V); that the Forest Service's failure to achieve the AML violates the MNF's Forest Plan (Claim IV); and that the Forest Service is responsible for the unlawful take of Middle Columbia River (MCR) steelhead in violation of the ESA.

**STANDARDS**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

Each of the three claims at issue in the subject motions is governed by a different substantive statute, and a different standard and scope of review. Accordingly, the court provides a brief overview of the statutory and regulatory framework applicable to each claim, an overview of the claim itself, and the standard and scope of review for that claim. The claims are addressed in the order presented by the parties in their briefing.

    A.    The Wild Horses Act and Claim V

Congress enacted the Wild Horses Act in 1971 to protect wild free-roaming horses and burros as an integral part of the natural area where they were found. 16 U.S.C. § 1331. The

2 - OPINION AND ORDER

Secretary is directed to manage wild free-roaming horses and burros as components of federal lands in a manner that is "designed to achieve and maintain a thriving natural ecological balance on the public lands," and must consult with the state wildlife agency to ensure that the natural balance of all wildlife species is considered. *Id.* § 1333(a). In 1978, the Wild Horses Act was amended to "facilitate the humane adoption or disposal of excess wild free-roaming horses and burros which because they exceed the carrying capacity of the range, pose a threat to their own habitat, fish, wildlife, recreation, water, and soil conservation, domestic livestock grazing, and other rangeland values." 43 U.S.C. § 1901(a)(6). "Excess animals" are defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

> To comply with his management duties:
>
> The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands. The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine [AMLs] of wild free-roaming horses and burros on these areas of the public lands; and determine whether [AMLs] should be achieved by the removal or destruction of excess animals . . . . In making such determinations the Secretary shall consult with the [FWS], wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals whom he determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.

16 U.S.C. § 1333(b)(1). Pursuant to regulation, the Forest Service must establish wild horse territories, develop management plans for each territory, and determine AMLs for each territory. 36 C.F.R. § 222.21.

3 - OPINION AND ORDER

Claim V asserts that the Forest Service violated the Wild Horses Act by failing to reevaluate the MCWHT's AML when it issued the 2007 Wild Horse Plan. The court's review of this claim is governed by the Administrative Procedure Act's (APA) "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A) (2006); *Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D.C. Nev. 1975). Under this standard of review, the court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

To determine whether an agency decision is arbitrary and capricious, the court should "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). After considering the relevant factors, the agency must articulate a satisfactory explanation for its action, including a rational connection between the facts found and the agency's conclusions. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008). Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2011). For this claim, the scope of review is limited to the administrative record before the Forest Service at the time the challenged decision was made. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).

**B.    The NFMA and Claim IV**

The NFMA was enacted in 1976 as an amendment to the Forest and Rangeland Renewable Resources Planning Act of 1974. 16 U.S.C. §§ 1600 *et seq*. In concert with the Multiple-Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528-31, the NMFA provides the statutory framework by which the Forest Service is to manage National Forest System lands. *The*

4 - OPINION AND ORDER

*Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (overturned on other grounds). The NFMA requires the Forest Service to manage Forest System Lands in order to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). The NFMA directs the Forest Service to develop an integrated land and resource management plan (Forest Plan) for each unit of the National Forest System. *Id*. § 1604(a),(f). In formulating a Forest Plan, the Forest Service must "use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Id.* § 1604(b). After a Forest Plan is developed, all subsequent Forest Service actions must be consistent with that plan, which in turn, must be consistent with the NFMA. *Id*. § 1604(i); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002).

      Claim IV asserts that the Forest Service has violated, and continues to violate, the NFMA by failing to maintain a wild horse herd averaging 100 head, a goal that is set forth in Standard 83 of the MNF Plan. This claim is also analyzed pursuant to the APA, but not under § 706(2)'s "arbitrary and capricious" standard. Rather, this claim arises under § 706(1), which allows a court to "compel agency action unlawfully withheld or unreasonably delayed." Under this standard, a court can require an administrative agency to act, only so long as the action sought is a legally required and discrete action. *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64 (2004). The court's review of this claim is also limited to the administrative record, however, because plaintiffs allege a failure to act, there is no final decision and no end date for the administrative record.

      C.     The ESA and Claim III

      The purpose of the ESA is "to provide a means whereby the ecosystems upon which

5 - OPINION AND ORDER

endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b) (2006). The Secretary of the Interior must list species that are endangered or threatened, and designate critical habitat for that species. *Id.* § 1533(a).

Section 9 of the ESA prohibits the "take" of any listed species. 16 U.S.C. § 1538(a)(1). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The ESA's implementing regulations further define "harm" as an "act which actually kills or injures wildlife" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696-700 (1995) (upholding the regulatory definition of "harm").

In Claim III, plaintiffs allege that the Forest Service has caused "take" of MCR steelhead (a listed species under the ESA) in violation of § 9 by allowing too many wild horses in the MCWHT. The parties disagree regarding the appropriate standard and scope of review for this claim. Defendants invite the court to ignore the most recent Ninth Circuit case on this point and argue that the APA's standards and record review provisions apply to this claim. However, this court is bound by the Ninth Circuit and agrees with its conclusion that § 9 claims arise not under the APA's standards but under the citizen suit provisions of the ESA, which provide "an express, adequate remedy." *See Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) (holding that the APA's record review provisions do not apply to claims brought pursuant to "the substantive provisions of the ESA"); 16 U.S.C. § 1540(g); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006). Accordingly, the court reviews Claim III *de novo*

6 - OPINION AND ORDER

and allows both parties to submit extra record evidence regarding this claim.[1]

**Factual Background**

The MCWHT encompasses approximately 180,000 acres of land owned by the Forest Service, the U.S. Bureau of Land Management (BLM)[2], the Oregon Department of Fish and Wildlife, and private parties. In 1975, the Forest Service and BLM adopted a plan (1975 Wild Horse Plan) for managing the herd of wild horses in the MCWHT. The 1975 Wild Horse Plan provided census information, discussed management measures, and clarified the agencies' joint objective to "[m]aintain the herd of wild, free-roaming horses that ranges on the area not to exceed 100 head." AR 580-81.[3] The agencies estimated that 174 horses resided on the land, and planned to reduce the numbers to between 60-70 horses. AR 579, 581. One year later, the Forest Service changed its estimate to 200 horses, and adopted procedures for controlling the herds to keep the numbers consistent with the AML set forth in the 1975 Wild Horse Plan. AR 611-13.

In 1984, the Forest Service prepared and adopted an amended management plan for the MCWHT. AR 648. The 1984 Wild Horse Plan updated the Forest Service's population objectives to an average of 100 "horse units" (animals above weaning age) and explained that "with[in] limitation imposed by budgets, etc., the herd should not be permitted to exceed 140

---

[1] It is difficult to see how a claim regarding § 9's take prohibition could be analyzed pursuant to anything but a *de novo* standard with the admission of extra record evidence. Utilizing an arbitrary and capricious standard, or excluding extra record evidence, would be particularly bizarre in those suits brought to enjoin entirely future actions or those actions for which there is not an administrative record. 16 U.S.C. § 1540(g); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995).

[2] The BLM was dismissed from this action on December 14, 2010.

[3] "AR" designates the Forest Service's administrative record and "AR S" designates the supplemental administrative record.

7 - OPINION AND ORDER

horse units." AR 651. At the time the 1984 plan was created, the Forest Service had been conducting regular gathering operations to bring down the number of horses. AR 653, 656.

Subsequently, the NMFS listed the MCR steelhead as "threatened" under the ESA. 64 Fed. Reg. 14517 (Mar. 25, 1999). These anadromous fish utilize streams and rivers located within the John Day River Basin for spawning, rearing, and migration. *Id.* The NMFS also designated streams within the MCWHT as critical habitat for MCR steelhead.

In 2007, the agencies adopted the 2007 Wild Horse Plan. AR 25376-25413. The 2007 Wild Horse Plan utilizes an AML of 50-140 horses. AR 25382. The plan explains that census data from a 2006 study revealed that approximately 436 horses were present in the MCWHT. AR 25384. The plan directs the authorized officer to gather and remove excess horses according to five priorities: (1) emergencies requiring immediate adjustment in horse populations to maintain ecological balance; (2) court orders; (3) strays; (4) achieving AMLs; and (5) periodic unscheduled removals near steelhead habitat. AR 25387.

In recent years, the Forest Service has conducted a number of horse gathers. In 2004, 101 horses were gathered (46 were later released); in 2005, an additional 101 horses were gathered; in 2007, 130 horses were gathered; in 2008, 115 horses were gathered; between 2009 and 2010, 122 horses were gathered; and in 2011, 60 horses were gathered. AR 325, 30082-83, 31484, 31798, 31913, 32706, and 33071-72. The most recent census in the administrative record, conducted in 2011, resulted in 132 horses counted and an estimated population of 198 horses within the MCWHT. AR S-332.

For a number of years, this court has partially enjoined plaintiffs and other similarly situated ranchers from grazing based on violations of the bank alteration standards set forth in the incidental take statements for MCR steelhead in the MNF. *See, e.g., ONDA v. Kimbell*, No. 07-

8 - OPINION AND ORDER

1871-SU, 2008 WL 4186913 at *8 (D. Or. Sept. 5, 2008); *ONDA v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010).  Plaintiffs submitted declarations during those proceedings to show that many of the monitoring sites where violations occurred experienced concentrated use from wild horses.  Stout Decl. at 3.  This court partially vacated the injunction in 2009.  *ONDA v. Kimbell*, No. 07-1871-HA, 2009 WL 1663037 (D. Or. June 15, 2009).  However, plaintiffs were able to graze their cattle for only nineteen days in 2009, primarily on one pasture, because the bank alteration standards had already been violated on several pastures.  Stout Decl. at 3-4.  Plaintiffs contend that these violations were due to the overpopulation of wild horses in the area.

## DISCUSSION

### A.   Wild Horses Act Claim

Plaintiffs contend that the Forest Service violated the Wild Horses Act by failing to reevaluate the MCWHT's AML when it issued the 2007 Wild Horse Plan.  The 2007 Wild Horse Plan contains relatively little discussion of the appropriate AML.  The plan states that the "AML has been determined to be 50-140 horses" based on studies conducted in 1979 and 1983.  AR 25382-83.  In 1979, with 200 head "significant use (and damage) occurred . . . while at 100 head [in 1983] few areas of concentrated use were found and no areas of damage were found."  *Id*.

Plaintiffs argue that the 2007 Wild Horse Plan relaxed the 1984 AML of 100 head by switching to the 50-140 range, that the Forest Service failed to consider whether the AML was appropriate in light of the 436 horse census in 2006, and that the Forest Service failed to consider impacts of wild horses to MCR steelhead.

The implementing regulations to the Wild Horses Act require the Forest Service to set AMLs based on an analysis of each wild horse territory, an inventory of that territory, and a management plan based on the conditions of each territory.  36 CFR § 222.21(a)4-6.  The Forest

9 - OPINION AND ORDER

Service is directed to update horse management plans "whenever, needed, as determined by conditions on each territory." *Id*. at § 222.21(a)4. The Forest Service has "significant discretion" in setting AMLs. *In Defense of Animals v. Dept. of the Interior*, 737 F. Supp. 2d 1125, 1134 (E.D. Ca. 2010); *American Horse Protection Ass'n v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982) (noting that the findings regarding "wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information").

Given the breadth of discretion available to the Forest Service in setting AMLs, the court cannot conclude that the agency acted arbitrarily in setting or resetting the 100 head average. The Forest Service conducted a census, and concluded that, based on historic conditions, a 100 head average was appropriate; reasoning that at 100 head, no negative impacts of horse use had been documented. It is not this court's place to second-guess that judgment. The fact that the Forest Service failed to thoroughly analyze impacts to MCR steelhead does not warrant a remand to the agency under the Wild Horses Act, but under the ESA, which this court has already done. The government is awarded summary judgment on Claim V.

### B. NFMA Claim

Plaintiffs assert that the Forest Service has violated, and continues to violate, the NFMA by failing to maintain a wild horse herd averaging 100 head, a goal that is set forth in Standard 83 of the MNF Plan. The three questions before the court are whether the goal set forth in Standard 83 is discrete, whether the Forest Service is legally required to meet it, and assuming the Forest Service is required to meet it, whether it is an agency action that has been unreasonably delayed under the APA. *SUWA*, 542 U.S. at 64.

Standard 83 states, in its entirety, that the Forest Service will:

Conduct livestock management on the [MCWHT] to ensure that resource

> conditions meet management goals and standards. Resolve conflicts between livestock, big game, and wild horses in accordance with the maintenance of a wild horse herd averaging 100 head.

AR 871.

The first question this court must address in determining whether the Forest Service is required to implement Standard 83 by reducing the horse herd to 100 head is whether Standard 83 is sufficiently discrete to allow enforcement. In *SUWA*, the Supreme Court made it clear that broad statutory mandates are unenforceable under § 706(1) of the APA. 542 U.S. at 66. As an example of unenforceable statutory mandates, the Supreme Court specifically pointed to the Wild Horses Act's command to "'manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance'" 542 U.S. at 66-67 (citation omitted). To enforce broad mandates would interfere with agency discretion by substituting the judgment of the court with that of the expert agency. However, Standard 83 is not a broad statutory mandate. It specifies "the maintenance of a wild horse herd averaging 100 head." Were this court to enforce Standard 83, there is no risk of the court substituting its judgment for that of the Forest Service. The Forest Service has already decided 100 is the right number and the court would not be altering that. Accordingly, the court concludes that Standard 83 is not so nebulous as to be unenforceable.

The second question presented to the court is whether the goals expressed in Standard 83 constitute mandates the Forest Service is legally required to implement. "Failures to act are sometimes remediable under the APA, but not always." *SUWA*, 542 U.S. at 61. The government argues that Standard 83, as part of the MNF Plan, is not a regulation or statute and as such is unenforceable. However, at times the language in a Forest Plan "itself creates a commitment binding on the agency," and can be legally compelled. *Id.* at 71. "[A] land use plan is generally a

11 - OPINION AND ORDER

statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.*[4] A land use plan, such as a Forest Plan, is generally thought of as a policy document that does not bind particular implementation decisions. Otherwise, Forest Plans would "commit the agency to actions far in the future, for which funds have not yet been appropriated." *Id*. By enforcing some aspects of the Forest Plan, at the behest of a particular interest group, the court runs the risk of diverting funds from other goals set forth in the Plan which may otherwise be prioritized by the expert agency. Though not explicitly stated, a budgetary disclaimer is implied by certain goals set forth in a Forest Plan. *Id.*

Accordingly, the court must determine whether Standard 83 constitutes a "clear indication of binding commitment" to maintain a wild horse herd averaging 100 head. *Id.* at 69. The court concludes that it does not. By its terms, Standard 83 leaves a measure of discretion to the Forest Service in determining how to manage livestock, whether "resource conditions meet management goals and standards," and in determining whether there is a "conflict[] between livestock, big game, and wild horses." Standard 83 does not constitute a statement of binding self-commitment on the part of the Forest Service to maintain a 100 head wild horse herd regardless of other Forest Service commitments or budgetary constraints. Given the cost of horse gathers, and the 1984 horse plan's explicit budgetary disclaimer, it would be bizarre to read Standard 83 as existing without implicit budgetary limitations. AR 651. Standard 83 is unenforceable pursuant

---

[4] The Forest Service is constrained by an applicable Forest Plan and may not take actions inconsistent with the Forest Plan. 16 U.S.C. § 1604(i); *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005) ("It is well settled that the Forest Service's failure to comply with provisions of a Forest Plan is a violation of the NFMA"). In this case, the Forest Service is not alleged to have taken actions inconsistent with the Forest Plan, but with having failed to take actions contemplated by the Forest Plan.

to § 706(1) of the APA and summary judgment is granted to defendants on this claim.[5]

### C. ESA Claim

Plaintiffs contend that the Forest Service has caused take of MCR steelhead by allowing too many wild horses to remain in the MCWHT. To obtain relief on this claim, plaintiffs must prove by a preponderance of the evidence that the Forest Service's failure to control the wild horse population has resulted in a violation of the ESA by causing take of listed steelhead. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000); *Palila v. Hawaii Dept. of Land and Nat'l Resources,* 639 F.2d 495, 496 (9th Cir. 1981). "Take" includes actions that actually kill or injure steelhead, including "significant habitat modification or degradation where it actually kills or injures [a steelhead] by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. at 696-700.

Defendants contend that plaintiffs must prove that take is likely to occur in the future in order to prevail on their § 9 claim. Defendants cite *Center for Biological Diversity v. Marina Point Development Co.*, in support of this contention. 566 F.3d 794, 804 (9th Cir. 2009). In *Marina Point*, the Ninth Circuit noted that the ESA's citizen suit provision only allows injunctive relief, which is of course, forward looking. *Id.* (citing 16 U.S.C. § 1540(g)(1)(A)).[6] In *Marina Point*, the plaintiffs sued a company for activities allegedly harming bald eagles. 566 F.3d at

---

[5] Because Standard 83 is unenforceable, I do not reach the question of whether the Forest Service has unreasonably delayed attainment of the 100 head average.

[6] The ESA's citizen suit provision provides that "any person may commence a civil suit on his own behalf – (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)

13 - OPINION AND ORDER

804. However, the Ninth Circuit dismissed the suit on appeal because bald eagles had been delisted during the pendency of the appeal, and the defendant could no longer violate the ESA by harming an unlisted species. *Id*.

In arguing that plaintiffs must prove a likelihood of future take to prevail on their § 9 claim, defendants confuse the forward looking nature of the relief offered by the ESA's citizen suit provision and the violation of the Act that justifies the injunction. In order to prevail on their § 9 claim, plaintiffs must prove that the Forest Service is "in violation of any provision of the" ESA. 16 U.S.C. § 1540(g)(1)(A). While injunctive relief is forward looking, it is often used to remedy past or present harms and the term "in violation" connotes past, present, or future violations of the ESA.[7] To require a citizen plaintiff to prove that "take" is likely to occur in the future tips the balance away from the preservation of species and would thwart Congress' overriding purpose of providing "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and of providing "a program for the conservation of such . . . species." 16 U.S.C. § 1531(b); *Forest Conservation Council*, 50 F.3d at 785. That said, it is equally clear that the relative likelihood of future harm, as well as the need of a species for recovery from past harm, are factors a court should consider in tailoring the scope of injunctive relief.

Turning now to the merits of plaintiffs' § 9 claim, the court concludes that a material question of fact exists as to whether the Forest Service is in violation of the ESA. Previously, this court held on summary judgment that cattle had caused "take" of MCR steelhead in the MNF on three allotments where reliable evidence established that bank alteration had occurred at

---

[7] In fact, it has not always been settled that a plaintiff could obtain relief under the ESA for wholly future harm to listed species. *See Forest Conservation Council*, 50 F.3d at 785.

14 - OPINION AND ORDER

designated monitoring areas in the amounts of forty-nine, fifty-one, and sixty percent. *ONDA v. Tidwell*, 716 F. Supp. 2d at 1006. Though bank alteration had been measured in excess of the levels established in the incidental take statements for MCR steelhead on a number of other allotments, the court did not conclude that "take" had occurred. *Id*. Here, as both parties appeared to concede at oral argument, the evidence is not as clear. There are legitimate and material disputes regarding a number of issues including the accuracy of measurements taken by the parties respective experts[8], the expertise of those experts, and the differences between the impacts to MCR steelhead caused by wild horses and cattle at particular levels of bank alteration. These disputes cannot be resolved on summary judgment, and require the benefit of live testimony and exhibits during trial. Accordingly, summary judgment is denied to both parties on plaintiffs' § 9 claim.

## **CONCLUSION**

For the reasons provided, plaintiffs' Motion for Summary Judgment [69] is DENIED and defendants' Cross-Motion for Summary Judgment [75] is GRANTED as to Claims IV and V and DENIED as to Claim III.

IT IS SO ORDERED.

DATED this 24th day of April, 2012.

                                            /s/ Ancer L. Haggerty
                                            Ancer L. Haggerty
                                      United States District Judge

---

[8] The court takes notice of plaintiffs' assertion [111] that defendant's demonstrative exhibit consisting of a map of the MCWHT is incorrect in certain particulars. These allegations can best be resolved during trial.